08-0838-cv
ProShipLine, Inc. v. Aspen Infrastructures, Ltd.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2008

(Argued: March 12, 2009          Decided: October 22, 2009)

Docket No. 08-0838-cv

--------------------------------------

PROSHIPLINE, INC.,

Plaintiff-Appellant,

- v. -

ASPEN INFRASTRUCTURES, LTD.,

Defendant-Appellee.

--------------------------------------

Before:   McLAUGHLIN and SACK, Circuit Judges, and KAPLAN,
          District Judge.[*]

Appeal from a judgment of the United States District Court for the Southern District of New York. The district court (Robert W. Sweet, Judge) vacated a maritime attachment, concluding that (1) maritime jurisdiction was absent, (2) both the party that attached the funds and the party that owned the funds were present in another jurisdiction -- the Southern District of Texas, and (3) the party that had sought and secured the attachment abused the ex parte nature of the attachment process. We disagree with the district court as to the first

---

[*] The Honorable Lewis A. Kaplan, of the United States District Court for the Southern District of New York, sitting by designation.

ground for vacatur, but agree with it as to the second, and therefore affirm without reaching the third.

Affirmed.

> JOHN SULLIVAN (Andrew R. Brown, of counsel) Hill Rivkins & Hayden LLP, New York, New York, for Plaintiff-Appellant.

> JOHN ORZEL (Vincent M. DeOrchis, of counsel) DeOrchis & Partners, LLP, New York, New York, for Defendants-Appellees.

SACK, Circuit Judge:

ProShipLine, Inc., the plaintiff-appellant, and EP-Team, Inc., not a party to this proceeding, are engaged in a breach-of-contract dispute with Aspen Infrastructures, Ltd., the defendant-appellee. What appears to have been a relatively simple matter, however, has metastasized, spreading across several proceedings spanning a variety of districts, states, and continents. Two separate proceedings related to this dispute are pending in the Southern District of New York. In one, Aspen secured an ex parte order of maritime attachment against EP-Team's assets. In the second, ProShipLine sought and secured an ex parte order of attachment against Aspen's assets worth close to two million dollars. On Aspen's motion, the district court vacated ProShipLine's attachment of Aspen's assets, concluding, inter alia, that both Aspen and ProShipLine are present in the Southern District of Texas. On appeal in this second case only, ProShipLine challenges the vacatur. We affirm.

2

**BACKGROUND**

<u>The Parties</u>

The facts underlying this appeal, including those set forth in the district court's Opinion and Order of February 1, 2008, see <u>ProShipLine, Inc. v. Aspen Infrastructures, Ltd.</u>, 533 F. Supp. 2d 422, 424-26 (S.D.N.Y. 2008) ("<u>ProShipLine</u>"), upon which we rely, are uncontested. Aspen is an Indian corporation associated with Suzlon Energy Ltd. ("Suzlon"). We refer to Aspen and Suzlon collectively as "Aspen." Aspen manufactures and markets wind turbines -- windmills that convert wind energy into electricity. It manufactures turbine components in India and then ships them to purchasers in market countries, including the United States, for installation. Aspen ships these components on ocean-going vessels that it time-charters. In an attempt to ensure that the vessels are used efficiently when not carrying Aspen products, i.e., to avoid "deadhead" return of empty vessels from market countries to India, Aspen entered into the contract carriage business, soliciting cargos from the market countries with destinations in Asia.

On April 9, 2006, as part of this effort, Aspen and EP-Team entered into a "Sales and Logistics Service Agreement," by which EP-Team was appointed as Aspen's general sales and port service agent in the United States. In connection with this arrangement, EP-Team established ProShipLine -- the appellant here -- to act as Aspen's agent.

3

Under the agreement, either party had the right to terminate the "arrangement" on 30 days' notice "without stating any cause" and at "any time during the currency of [the] agreement." The contract contained a choice-of-law clause providing that it would be construed and enforced in accordance with English law, and a forum selection clause providing that all disputes arising from the agreement would be resolved by arbitration in Singapore.

Aspen eventually became dissatisfied with the arrangement. By email dated July 5, 2007, Aspen informed EP-Team that as of August 1, 2007, Aspen "will have alternate arrangements in place" for its shipping services and that as of that date "Proshipline will [cease] to be our agent[]." Email from Sanjivv G. Bangad to David Pulk and Neil Johnson (July 5, 2007). By letter to Aspen dated July 6, 2007, EP-Team asserted that the email constituted a "purported termination" of the agreement "in violation of the Services Agreement" and was "actionable by EP-Team." Letter from Richard A. Lowe to Sanjeev Bangad (July 6, 2007). By letter dated July 13, 2007, Aspen informed EP-Team that there was "no contract" between Aspen and EP-Team, that the agreement did not purport to appoint EP-Team as the exclusive agent for Aspen in America, and that ProShipLine was "failing to perform in accordance with the agreement or its spirit in any event." Letter from Christopher Chauncy to Shannon, Gracey, Ratliff and Miller, LLP (July 13, 2007). By letter dated July 30, 2007, EP-Team told Aspen that "as of

4

Midnight July 31, 2007, [EP-Team/ProShipLine will] not be in a position to act in any capacity on behalf of [Aspen]." Letter from Richard A. Lowe to Christopher Chauncy (July 30, 2007).

Procedural History

In October 2007, Aspen named EP-Team as a defendant in a proceeding in the Southern District of New York over which Judge Robert W. Sweet was reassigned to preside. See Aspen Infrastructures Ltd. v. E.P. Team, Inc., No. 07 Civ. 8813 (S.D.N.Y. Oct. 12, 2007). Some two months later, by verified complaint dated December 3, 2007, ProShipLine, without EP-Team, initiated the instant litigation against Aspen, seeking a Writ of Maritime Attachment and Garnishment in the amount of $6,390,000. See Verified Complaint, ProShipLine, Inc. v. Aspen Infrastructures, Ltd., No. 07 Civ. 10969 (S.D.N.Y. Dec. 3, 2007) (Doc. No. 1). We refer to the former as the "First New York Action" and the latter -- the case now before us on appeal -- as the "Second New York Action."

On December 4, 2007, Judge John F. Keenan, sitting as Part I judge, issued the order in the Second New York Action in the full amount. See Order Directing Clerk to Issue Process of Maritime Attachment and Garnishment, ProShipLine, Inc. v. Aspen Infrastructures, Ltd., No. 07 Civ. 10969 (S.D.N.Y. Dec. 4, 2007) (Doc. No. 5). On Saturday, January 5, 2008, ProShipLine's counsel "gave notice that an electronic fund transfer belonging to [Aspen] in the amount of US$1,999,964.00 had been restrained." Declaration of John A. Orzel ¶ 6 (Jan. 9, 2008). Thereafter, the

5

case, having been deemed to be related to the First New York Action, was assigned to Judge Robert W. Sweet. See Notice of Reassignment, ProShipLine, Inc. v. Aspen Infrastructures, Ltd., No. 07 Civ. 10969 (S.D.N.Y. Dec. 18, 2007) (Doc. No. 8).[1] On January 10, 2008, Aspen moved in the Second New York Action to vacate ProShipLine's attachment of its funds. See ProShipLine, Inc. v. Aspen Infrastructures, Ltd., No. 07 Civ. 10969 (S.D.N.Y. Jan. 10, 2008) (Doc. No. 10). By Opinion and Order dated February 1, 2008, the district court vacated that attachment. See ProShipLine, 533 F. Supp. 2d at 427.

The district court based its vacatur on three grounds: (1) the court lacked maritime jurisdiction because the agreement at issue was an executory requirements contract, id.; (2) Aspen is present in the Southern District of Texas, where ProShipLine has its headquarters and principal place of business, id.; and (3) ProShipLine abused the ex parte nature of the maritime attachment rules, id. at 427-29.

ProShipLine appeals, asserting that the district court erred in all three respects. We affirm solely on the ground that the district court did not err in concluding that the parties were both present in the Southern District of Texas.

---

[1] In addition to the two New York actions, the parties have been engaged in various other proceedings. See EP-Team, Inc. v. Aspen Infrastructure, Ltd., No. 4:07 Civ. 2549 (S.D. Tex. Aug. 6, 2007); ProShipLine, Inc. v. Aspen Infrastructures, Ltd., No. 3:07 Civ. 5660 (W.D. Wash. Nov. 27, 2007); ProShipLine, Inc. v. M/V Beluga Revolution, No. 4:07 Civ. 04170 (S.D. Tex. Dec. 7, 2007); Aspen Infrastructures, Ltd. v. EP-Team, Inc., ARB No. 063 of 2007 (Sing. Int'l Arb. Ctr. 2007).

**DISCUSSION**

I.   Standard of Review

"We generally review the district court's decision vacating a maritime attachment order for abuse of discretion." Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 439 (2d Cir. 2006). A district court "necessarily abuses its discretion when its decision rests on an error of law or a clearly erroneous finding of fact." Id. Therefore, we "review[] the legal predicate for an exercise of discretion[] . . . de novo." Id.

II.  Maritime Jurisdiction

Federal law controls the interpretation of maritime contracts so long as the dispute is not "inherently local." Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd., 543 U.S. 14, 23 (2004); accord Kossick v. United Fruit Co., 365 U.S. 731, 735 (1961). Contracts that are "by their terms entered into in connection with [a] maritime commercial venture . . . are therefore maritime in nature [and] the Court has jurisdiction of the claims brought thereunder pursuant to 28 U.S.C. § 1333." Williamson v. Recovery Ltd. P'ship, 542 F.3d 43, 49 (2d Cir. 2008) (internal quotation marks omitted), cert. denied sub nom. Columbus Exploration, LLC v. Williamson, 129 S. Ct. 946 (2009).

In Norfolk Southern Railway Co., the Supreme Court rejected a "spatial approach," 543 U.S. at 24, for determining whether contracts are "maritime in nature," id. at 26. The Court observed that maritime commerce "is often inseparable from some

7

land-based obligations," especially in light of the fact that "[t]he international transportation industry clearly has moved into a new era -- the age of multimodalism, door-to-door transport based on efficient use of all available modes of transportation by air, water, and land." Id. at 25 (internal quotation marks omitted). Instead, the Supreme Court has endorsed a "conceptual approach" which, guided by "the fundamental interest giving rise to maritime jurisdiction [--] the protection of maritime commerce" -- focuses upon "whether the principal objective of a contract is maritime commerce." Id. (internal quotation marks omitted); accord Williamson, 542 F.3d at 49; Folksamerica Reinsurance Co. v. Clean Water of New York, Inc., 413 F.3d 307, 311, (2d Cir. 2005); Sompo Japan Ins. Co. v. Union Pac. R.R. Co., 456 F.3d 54, 71 n.17 (2d Cir. 2006).[2]

---

[2] In cases prior to Norfolk Southern Railway Co., this Circuit required that courts "first make a 'threshold inquiry' into the subject matter of the dispute." See Folksamerica, 413 F.3d at 312 (emphasis in original). In other words, we have held that "[b]efore attempting to categorize contractual rights as maritime or non-maritime, a federal court must first consider whether an issue related to maritime interests has been raised." Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 199 (2d Cir. 1992). The panel in Folksamerica noted "some uncertainty as to the extent to which this Court's 'threshold inquiry' test survives . . . Norfolk Southern Railway Co." 413 F.3d at 313. In Norfolk Southern Railway Co., the Supreme Court "focused entirely on the underlying contract" and did not explicitly engage in such a "threshold inquiry." See Folksamerica, 413 F.3d at 313-14. We recognized, however, that Norfolk Southern Railway Co. is "readily distinguishable" from cases in this Circuit that we have found did not survive our threshold inquiry. Id. at 313. This case is also readily distinguishable from our prior "threshold inquiry" cases, so we need not examine "how Norfolk Southern Railway Co. might circumscribe our 'threshold inquiry' doctrine, if at all." Id.

8

### III.  Maritime Attachment

"The power to grant attachments in admiralty [i.e., maritime attachments] is an inherent component of the admiralty jurisdiction given to the federal courts under Article III of the Constitution." Aqua Stoli, 460 F.3d at 437.  The "historical purpose [of the power] has been two-fold: first, to gain jurisdiction over an absent defendant; and second, to assure satisfaction of a judgment." Id.  "Maritime attachments arose because it is frequently, but not always, more difficult to find property of parties to a maritime dispute than of parties to a traditional civil action.  Maritime parties are peripatetic, and their assets are often transitory." Id. at 443.  The "traditional policy underlying maritime attachment," which is "to permit the attachments of assets wherever they can be found and not to require the plaintiff to scour the globe to find a proper forum for suit or property of the defendant sufficient to satisfy a judgment," has been "implemented by a relatively broad maritime attachment rule, under which the attachment is quite easily obtained." Id.

Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims to the Federal Rules of Civil Procedure (the "Supplemental Rules") sets forth the process by which a party can attach another party's assets.  The rule provides:

> If a defendant is not found within the
> district when a verified complaint praying
> for attachment . . . [is] filed, a verified
> complaint may contain a prayer for process to
> attach the defendant's tangible or intangible

9

> personal property -- up to the amount sued for -- in the hands of garnishees named in the process. . . . The court must review the complaint and affidavit and, if the conditions of this Rule B appear to exist, enter an order so stating and authorizing process of attachment and garnishment.

Fed. R. Civ. P., Adm. Supp. Rule B(1) ("Supp. Rule B(1)").  The plaintiff must file with the complaint an "affidavit stating that, to the affiant's knowledge, or on information and belief, the defendant cannot be found within the [judicial] district."  Id.; see also Aqua Stoli, 460 F.3d at 438.  Orders of maritime attachment "may be [and normally are] requested and granted ex parte, though notice of the attachment to the defendant via appropriate service is required."  Aqua Stoli, 460 F.3d at 438 (citing Supp. Rules B(2), E(3)).

The Admiralty Rules do not explain what it means to be "found within [a] district."  Cf. Supp. Rule B, Advisory Committee Notes (1966 Adoption) (noting that "[t]he subject seems one best left for the time being to development on a case-by-case basis").  This Court has noted, however, that "the requirement . . . present[s] a two-pronged inquiry: first, whether (the respondent) can be found within the district in terms of jurisdiction, and second, if so, whether it can be found for service of process."  Seawind Compania, S.A. v. Crescent Line, Inc., 320 F.2d 580, 582 (2d Cir. 1963) (internal quotation marks omitted); see also STX Panocean (UK) Co., Ltd. v. Glory Wealth Shipping Pte Ltd., 560 F.3d 127, 130 (2d Cir. 2009).  Put differently, to be found within the jurisdiction so as to render

10

an attachment inappropriate, the respondent must not only be found for service of process,[3] but also be "engaged in sufficient activity in the district to subject it to jurisdiction even in the absence of a resident agent expressly authorized to accept process." Seawind, 320 F.2d at 583.[4]

---

[3] We appear to have concluded that, at least in certain circumstances, an entity may be "found" within a judicial district even where the actual service contemplated would physically occur in another district within the same state. See Chilean Line Inc. v. United States, 344 F.2d 757, 761-62 (2d Cir. 1965). Subsequently, however, we suggested that to be "found" within a district for purposes of Rule B an entity must be "'found within the geographical confines of the district for service of process.'" Aqua Stoli, 460 F.3d at 443. At least one district court judge in this Circuit has noted and explored this tension. See Amber Int'l Nav., Inc. v. Repinter Int'l Shipping Co., S.A., No. 09 Civ. 3897, 2009 WL 1883251, at *1, 2009 U.S. Dist. LEXIS 55779, at *2 (S.D.N.Y. June 30, 2009) (Gerard E. Lynch, Judge) (noting that "the case law critical to determining whether [the defendant] is found within this district for purposes of Rule B is in a state of disarray in this Circuit"). We note that we are dealing here with equitable vacatur rather than vacatur for failure to comply with Rule B. In any event, as is discussed in further detail below, Aspen was found to maintain a "general agent within th[e] district [at issue -- the Southern District of Texas --] who could be served with process," ProShipLine, Inc. v. M/V Beluga Revolution, No. H-07-4170, 2007 WL 4481101, at *1, 2007 U.S. Dist. LEXIS 92674, at *2-*3 (S.D. Tex. Dec. 18, 2007), and we affirm that finding. Therefore, not faced with a situation where Aspen's general agent was not present in the Southern District of Texas, but otherwise present in the state, for service of process, we neither address nor resolve this tension here.

[4]

> The time for determining whether a defendant is 'found' in the district is set at the time of the filing of the verified complaint that prays for attachment and the affidavit required by Rule B(1)(b). . . . A defendant cannot defeat the security purpose of attachment by appointing an agent for service of process after the complaint and affidavit are filed.

11

We thus interpret the Rule to adopt a "'somewhat arbitrary compromise which assumes that the plaintiff will not require the protection of an attachment for security, nor should the defendant be subjected to it,'" if the defendant is shown to meet both prongs of the Seawind test, and "'assumes on the other hand that the plaintiff's interests are not adequately protected'" if the defendant is not so shown. Aqua Stoli, 460 F.3d at 443 (quoting Integrated Container Serv., Inc. v. Starlines Container Shipping, Ltd., 476 F. Supp. 119, 122 (S.D.N.Y. 1979)).[5]

IV. Vacatur

The defendant -- i.e., the owner of the attached funds -- or "any other person with an interest in the property seized," Supp. Rule E, Advisory Committee Notes (1985 Amendment), can make a motion pursuant to Rule E of the Supplemental Rules to contest the validity of the attachment. Rule E "entitle[s the owner of the attached funds] to a prompt hearing at which the plaintiff [is] required to show why the arrest or attachment should not be vacated." Supp. Rule E(4)(f). The rule is "designed to satisfy the constitutional requirement of due process by guaranteeing to the [defendant] a prompt post-seizure hearing at which he can attack the complaint, the arrest, the security demanded, or any

---

Supp. Rule B, Advisory Committee Notes (2005 Amendments).

[5] Federal law "defines the requirements necessary for satisfaction of Rule B," but federal courts "look to the relevant state law to determine if those requirements are met." STX Panocean, 560 F.3d at 128.

other alleged deficiency in the proceedings." Supp. Rule E, Advisory Committee Notes (1985 Amendment).

At such a hearing, the plaintiff -- the party who has sought the attachment -- bears "the burden of showing why the seizure should not be vacated." Id.; accord Supp. Rule B, Advisory Committee Notes (1966 Adoption) (noting that the plaintiff has "the burden of establishing that the defendant cannot be found within the district"). The plaintiff must demonstrate that "1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment." Aqua Stoli, 460 F.3d at 445 & n.5 (footnote omitted); accord Transportes Navieros y Terrestres S.A. de C.V. v. Fairmount Heavy Transp. N.V., 572 F.3d 96, 103 (2d Cir. 2009).

The "hard-and-fast rule" established by the Supplemental Rules "may occasionally sweep too broadly," but "Congress chose a determinate rule rather than a flexible standard to ensure that attachments may be obtained with a minimum of litigation." Aqua Stoli, 460 F.3d at 443.

"Superficial compliance with Rule B, while necessary," however, "is not sufficient [to determine that a] maritime attachment is appropriate." Williamson, 542 F.3d at 52. Even with an attachment secured in conformity with Rule B, equitable vacatur pursuant to Rule E may nonetheless be in order. We have disavowed the notion "that district courts are without any

13

equitable discretion to vacate maritime attachments that comply with Rule B." Aqua Stoli, 460 F.3d at 444. Yet we have cautioned that equitable vacatur is appropriate "only in certain limited circumstances." Id. "[W]e have not yet had occasion to determine the full scope of a district court's vacatur power" under the Supplemental Rules, Williamson, 542 F.3d at 52, but certain principles are well-established. For example, equitable vacatur may be appropriate where the defendant can demonstrate that "1) [it] is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain in personam jurisdiction over the defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise." Aqua Stoli, 460 F.3d at 445.[6]

V. Analysis

A. Maritime Jurisdiction[7]

On appeal, ProShipLine contends that the district court erred in concluding that it lacked jurisdiction to order the attachment on the ground that the contract did not confer

---

[6] Although the plaintiff bears the burden of demonstrating that the attachment "was properly ordered and complied with the requirements of Rules B and E," we have noted that the Supplemental Rules "require[] the defendant to establish any equitable grounds for vacatur." Aqua Stoli, 460 F.3d at 445 n.5.

[7] Whether or not we are required to address the jurisdictional issue first -- i.e., whether Article III admiralty jurisdiction is present -- even though we affirm on another ground, cf. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998) (limiting "the 'doctrine of hypothetical jurisdiction'"), we think it advisable to do so as part of a complete analysis of the issues on appeal.

14

admiralty jurisdiction. See ProShipLine, 533 F. Supp. 2d at 427. We agree that this was error, and conclude that there is admiralty jurisdiction here.

The court proffered two reasons to support its decision: first, that the dispute concerned "the alleged breach of an executory contract," id.;[8] and second, that the contract concerned the "provi[sion of] services to any vessel under Aspen's control expected to call at U.S. ports in the future," and was therefore "'analogous to requirements contracts that courts have found to be outside of admiralty jurisdiction, rather than the one-transaction supply or repair contracts that fall within admiralty jurisdiction,'" id. at 427 (quoting Dolco Invs., Ltd. v. Moonriver Dev., Ltd., 486 F. Supp. 2d 261, 267-68 (S.D.N.Y. 2007) (Robert W. Sweet, Judge)).

We conclude, however, that a contrary result is mandated by Norfolk Southern Railway Co. and its progeny, under which a contract confers maritime jurisdiction so long as its "principal objective . . . is maritime commerce." Norfolk S. Ry.

---

[8] "An executory contract . . . is one in which the promisee's rights do not immediately come into existence but are conditioned upon some further performance, usually by the promisee." Fed. Deposit Ins. Co. v. Malin, 802 F.2d 12, 17 (2d Cir. 1986); cf. Black's Law Dictionary 369 (8th ed. (2009)) (defining "executory contract" as "[a] contract that remains wholly unperformed or for which there remains something still to be done on both sides, often as a component of a larger transaction"); In re Wireless Data, Inc., 547 F.3d 484, 488 n.1 (2d Cir. 2008) (noting that under the Bankruptcy Code, an executory contract is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other" (internal quotation marks omitted)).

15

Co., 543 U.S. at 25. The agreement at issue here specifically "'reference[s] maritime service[s] or maritime transactions.'" Williamson, 542 F.3d at 49 (quoting Norfolk S. Ry. Co., 543 U.S. at 24); accord Folksamerica, 413 F.3d at 312. It concerns "the furnishing of services, supplies, or facilities to vessels . . . in maritime commerce or navigation." CTI-Container Leasing Corp. v. Oceanic Operations Corp., 682 F.2d 377, 379 (2d Cir. 1982) (internal quotation marks omitted). By the agreement, Aspen appointed EP-Team "as its sales agent to establish a sales and management operation to secure freight and associated revenue" to fill the excess capacity on Suzlon's time-chartered vessels. EP-Team was charged with facilitating voyages from the United States to India to ensure a full and efficient use of the vessels. On this basis, there is maritime jurisdiction.

We find unconvincing the district court's suggestion that there can be no maritime jurisdiction if the contract under which relief is sought is executory in nature. More than fifty years ago, the Supreme Court concluded that an alleged breach of an executory contract conferred maritime jurisdiction. See Archawski v. Hanioti, 350 U.S. 532, 533 (1956); accord Compania Argentina De Navegacion Dodero v. Atlas Maritime Corp., 144 F. Supp. 13, 14 (S.D.N.Y. 1956) (rejecting the proposition that executory contracts are not within the admiralty jurisdiction of the federal courts and concluding that "[i]f such was ever the law, it is certainly not the law since the decision of the United

16

States Supreme Court in Archawski v. Hanioti, [350 U.S. 532, 533-34 (1956)]").  And as the Seventh Circuit observed even earlier:

> If the contract contemplate[s] maritime service, and ha[s] reference to maritime transactions, it is within the jurisdiction of the admiral[ty].  This doctrine is no longer subject to contention.  [I]t has been held, and, we think, without dissent, that executory contracts of a maritime character are within the jurisdiction of the admiralty, and that damages for breach of such a contract may be awarded by the courts of admiralty.

Boutin v. Rudd, 82 F. 685, 686-87 (7th Cir. 1897); S.S. Overdale Co. v. Turner, 206 F. 339, 341 (E.D. Pa. 1913) (noting that a "purely executory [contract] for performance of some maritime service" confers maritime jurisdiction); cf. The Yankee, 37 F. Supp. 512, 514 (E.D.N.Y. 1941) (concluding that an "executory contract to render a maritime service" in "the absence of part performance" does not confer admiralty jurisdiction).  Thus, so long as a contract is maritime in nature, the fact that it is executory does not foreclose maritime jurisdiction.

We are similarly unpersuaded by the district court's conclusion that "'requirements contracts,'" as opposed to "'one-transaction supply or repair contracts,'" are necessarily "'outside of admiralty jurisdiction.'"  ProShipLine, 533 F. Supp. 2d at 427 (quoting Dolco Invs., Ltd., 486 F. Supp. at 268).  Even assuming the cases cited by the district court in this regard -- the most recent of which predates Norfolk Southern Railway Co. by nearly a half century, see Compania Argentina De Navegacion Dodero, 144 F. Supp. 13 (S.D.N.Y. 1956), two of which directly

17

conflict with the district court's conclusion that executory contracts do not confer admiralty jurisdiction, see id. at 14; S.S. Overdale Co., 206 F. at 341, and none of which are binding on this court -- have merit, they are distinguishable.  In each case in which the contract was found not to confer maritime jurisdiction, the contracted-for service held not to give rise to maritime jurisdiction was in some fundamental way non-maritime in nature.  See S.S. Overdale Co., 206 F. at 341 (requirements contract for the sale of coal to a fleet of steamships not maritime contract); Garcia v. Warner, Quinlan Co., 9 F. Supp. 1010, 1011 (S.D.N.Y. 1934) (year-long requirements contract for the sale of fuel oil to a fleet of steam ships not maritime contract); see also Diefenthal v. Hamburg Am. Line, 46 F. 397 (E.D. La. 1891) (requirements contract for the sale of meat, eggs, and vegetables for a year at fixed prices not maritime contract).

Obviously, non-maritime businesses need coal, fuel oil, and eggs, too.  But the service under contract here -- the arranging of sea voyages and port services -- has an undeniably maritime flavor.  See S.S. Overdale, 206 F. at 341 (maritime contract "[makes] reference to a[] particular maritime service or . . . to the navigation, business, or commerce of the sea"); cf. Williamson, 542 F.3d at 49 (noting that services or contracts that make sense outside of the context of maritime commerce, such as "standard non-compete, nondisclosure, and lease contract agreements," can nonetheless be properly considered maritime

18

contracts if they "reference maritime service or maritime transactions").

For these reasons, we conclude, contrary to the conclusion of the district court, that federal maritime jurisdiction exists.

B.   Presence in the Southern District of Texas

We must decide, then, whether the district court abused its discretion in vacating the attachment.  We conclude that it did not.

As we have noted, equitable vacatur may be appropriate where "the plaintiff and defendant are both present in the same district and would be subject to jurisdiction there, but the plaintiff goes to another district to attach the defendant's assets."  Aqua Stoli, 460 F.3d at 444-45; accord Williamson, 542 F.3d at 51.  The record supports the conclusion that ProShipLine sought an ex parte order of attachment in the Southern District of New York despite the fact that both Aspen and ProShipLine were present in the Southern District of Texas and subject to jurisdiction there.

On December 10, 2007, in connection with ProShipLine, Inc. v. M/V Beluga Revolution, No. 4:07 Civ. 04170 (S.D. Tex. Dec. 7, 2007), one of the two proceedings in the Southern District of Texas associated with this dispute, ProShipLine and EP-Team secured a writ of maritime attachment against Aspen's assets aboard the M/V Beluga Revolution, one of Aspen's vessels then docked in the Southern District of Texas.  Aspen sought

19

vacatur of the attachment in part on the basis that Aspen was "found within the district." ProShipLine, Inc. v. M/V Beluga Revolution, No. H-07-4170, 2007 WL 4481101, at *1, 2007 U.S. Dist. LEXIS 92674, at *3 (S.D. Tex. Dec. 18, 2007). In connection with the dispute, the parties -- Aspen, EP-Team, and ProShipLine -- "concede[d] that Aspen is present in [the Southern District of Texas] as a result of its substantial and ongoing commercial activities [in the district]." Id. at *1, 2007 U.S. Dist. LEXIS 92674, at *1.

On December 14, 2007, the United States District Court for the Southern District of Texas (John R. Froeschner, Magistrate Judge) conducted a hearing on Aspen's motion for vacatur. Id. As set forth in its Opinion and Order of December 18, 2007, the district court found "that Aspen maintains a general agent within this district who could be served with process" that "qualifies as a [managing] agent for purposes of service of process under Rule 4(h) of the Federal Rules of Civil Procedure." Id. at *1, 2007 U.S. Dist. LEXIS 92674, at *2-*3. On the basis of Aspen's "contacts with the district" and because it "can be found within the geographical confines of the district for service of process," the district court vacated the attachment as "improperly issued." Id., 2007 U.S. Dist. LEXIS 92674, at *4.

In the proceedings before Judge Sweet, the district court concluded that "[b]y its Opinion and Order dated December 18, 2007, the United States District Court for the Southern

20

District of Texas has already found that Aspen is present within that district, where ProShipLine has its headquarters and principal place of business." ProShipLine, 533 F. Supp. 2d at 427. The district court adopted that finding, and on that basis vacated the attachment. Id. at 429.

We conclude that vacatur on this ground was proper. ProShipLine is estopped from relitigating this factual issue -- that Aspen is present within the Southern District of Texas -- because it was "'actually litigated [by Aspen and ProShipLine] and decided by a court of competent jurisdiction in a prior action.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 547 F.3d 109, 112 (2d Cir. 2008).[9] And ProShipLine cannot plausibly contend that the Southern District of Texas is an inconvenient venue in which to litigate: Its headquarters and principal place of business are located there, see ProShipLine, 533 F. Supp. 2d at 427. ProShipLine does not argue that it is not present in the district. Indeed, the district has been convenient enough for ProShipLine to have chosen to initiate litigation against Aspen

[9] Following the February 1, 2008, Opinion and Order on appeal in this case, the district court for the Southern District of Texas (Lee H. Rosenthal, District Judge) affirmed the magistrate judge's order and findings. See ProShipLine, Inc. v. M/V Beluga Revolution, No. H-07-4170, 2008 WL 447707, at *3, 2008 U.S. Dist. LEXIS 12056, at *7 (S.D. Tex. Feb. 19, 2008) (overruling the objections of ProShipLine and EP-Team and affirming the magistrate judge's Opinion and Order, in part based on its conclusion that the "record in this case supports the Magistrate Judge's determination that [Aspen] maintained a general agent within this district that could be served with process"); see also ProShipLine, Inc. v. M/V Beluga Revolution, No. H-07-4170, 2008 WL 2673832, 2008 U.S. Dist. LEXIS 50721 (S.D. Tex. July 2, 2008) (denying ProShipLine and EP Team's motion for reconsideration).

21

in two separate actions there. See EP-Team, Inc. v. Aspen Infrastructure, Ltd., No. 4:07 Civ. 2549 (S.D. Tex. Aug. 8, 2007); ProShipLine, Inc. v. M/V Beluga Revolution, No. 4:07 Civ. 04170 (S.D. Tex. Dec. 7, 2007).

ProShipLine contends that Aspen's position in this action -- that it is present in the same district as ProShipLine -- "undercut[s] the claims Aspen has made in the [First New York Action] against EP-Team." ProShipLine Br. 23 n.3. It has not brought to this Court's attention, however, any inconsistent misrepresentations in this regard. And our review of the district court's opinion in this action and the subsequently issued opinion in the First New York Action, Aspen Infrastructures, Ltd. v. E.P. Team, Inc., No. 07 Civ. 8813, 2008 WL 2963491, 2008 U.S. Dist. LEXIS 59030 (S.D.N.Y. Aug. 1, 2008), reveals no such inconsistencies.

Equitable vacatur of writs of attachment, in contrast to vacatur for failure to comply with Rule B, turns not on the owner of the attached funds' relationship with the jurisdiction of attachment, but on both parties' relationship with another jurisdiction. For equitable vacatur to be granted on this basis, "the plaintiff [must be able to] obtain in personam jurisdiction over the defendant in [a] district where the plaintiff is located." Aqua Stoli, 460 F.3d at 445.

In the First New York Action, EP-Team moved for equitable vacatur of the order authorizing Aspen's attachment of EP-Team's assets in the Southern District of New York on the

22

grounds that both it and Aspen were present in the Southern District of Texas. Aspen Infrastructures, Ltd. v. E.P. Team, Inc., No. 07 civ. 8813, 2008 WL 2663491, at *1, 2008 U.S. Dist. LEXIS 59030, at *2-*3. The district court denied EP-Team's motion, concluding that "EP-Team's submissions on this motion [were] insufficient to establish its [presence in that] jurisdiction." Id. at *2, 2008 U.S. Dist. LEXIS 59030, at *5. Vacatur of the writ of attachment in the First New York Action was thus based on EP-Team's lack of presence in the Southern District of Texas.

By contrast, vacatur of the writ of attachment in the Second New York Action -- this one -- depends upon the presence of ProShipLine and Aspen, not EP-Team, in the Southern District of Texas. Aspen has, according to the district court, demonstrated that both of them are present in that district. Because ProShipLine and EP-Team are separate legal entities, it does not necessarily follow from ProShipLine's presence in the Southern District of Texas that EP-Team is also present there. Cf. Aspen Infrastructures, Ltd. v. E.P. Team, Inc., 2008 WL 2963491, at *2, 2008 U.S. Dist. LEXIS 59030, at *5 (noting that "the responsibilities of EP-Team and [ProShipLine] with respect to these various proceedings and the underlying agreement are elusive").

Even were the judgments in the First and Second New York actions inconsistent, moreover, inconsistency itself is not sufficient to require reversal of the vacatur of the maritime

23

attachment here.  The propriety of the decision in the First New York Action is not before us.  In the absence of support for the proposition that the district court vacated the writ of attachment in the case before us on appeal -- the Second New York Action -- in error, we affirm.  ProShipLine is not entitled to an attachment of Aspen's funds solely because Aspen's attachment of another entity's funds in a separate action might have been improper.  To the extent that the decision in the First New York Action was wrong, if it was, appeal from that decision, if available, is the avenue for recourse in this Court.[10]

## C.   Abuse of The Ex Parte Nature of Rule B Process

Having concluded that vacatur was proper, we need not, and do not, address whether the district court erred in concluding, in the alternative, that ProShipLine's actions constituted an abuse of the ex parte nature of Rule B process. We offer no views on that issue and none should be inferred from this opinion.

---

[10] Our review reveals no inconsistencies between the judgments of the New York court and the judgment of the Texas court.  The Texas district court's vacatur of the writ of the Texas attachment for failure to comply with Rule B depended solely on whether Aspen, not EP-Team or ProShipLine, was found in the Southern District of Texas.  See Proshipline, Inc. v. M/V Beluga Revolution, 2007 WL 4481101, at *1, 2007 U.S. Dist. LEXIS 92674, at *3; Supp. Rule B(1) (providing that attachment is only appropriate where "defendant is not found within the district"). Given that Aspen was found in that district, the maritime attachment did not meet the basic requirements of Rule B, and was vacated as "improperly issued." Proshipline, Inc. v. M/V Beluga Revolution, 2007 WL 4481101, at *1, 2007 U.S. Dist. LEXIS 92674, at *4.  And it does not necessarily follow from Aspen's presence in the district that EP-Team -- a completely separate entity -- would be present in the same jurisdiction.

24

**CONCLUSION**

For the foregoing reasons, the judgment of the district court is affirmed.